IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Shakeelah Finney, : CASES CONSOLIDATED
               Petitioner :
                :
      v. :
                :
Unemployment Compensation :
Board of Review, : Nos. 807-809 C.D. 2024
               Respondent : Submitted: July 7, 2025


BEFORE:   HONORABLE ANNE E. COVEY, Judge
             HONORABLE LORI A. DUMAS, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED:  September 9, 2025


       Shakeelah Finney (Claimant) petitions this Court pro se for review of the Unemployment Compensation (UC) Board of Review's (UCBR) May 10, 2024 orders[1] affirming the Referee's decisions that denied Claimant UC benefits under Section 402(b) of the UC Law (Law) and assessed a non-fault overpayment of benefits under Section 804(b)(1) of the Law. Essentially, the issue before this Court

---

      [1] On May 10, 2024, the UCBR issued three identical orders, docketed at 2024000507-BR, 2024000509-BR, and 2024000512-BR, which denied Claimant UC benefits under Section 402(b) of the UC Law (Law) (relating to voluntarily leaving work without cause of a necessitous and compelling nature), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b), and assessed a non-fault overpayment of benefits under Section 804(b)(1) of the Law, 43 P.S. § 874(b)(1). Claimant timely appealed from each of the UCBR's orders. By October 1, 2024 Order, this Court consolidated Claimant's appeals.

is whether Claimant voluntarily left her employment without a necessitous and compelling reason.[2]  After review, this Court affirms.

Supports Coordination Group, LLC (Employer) employed Claimant as a full-time service coordinator for clients in the Philadelphia area from January 30, 2023, through the last day she worked, June 9, 2023.  Claimant's job required her to spend a total of approximately 4 weeks every year visiting the homes of each of the 64 to 70 clients on her caseload twice.[3]  She worked remotely the rest of the year.  Claimant began maternity leave effective June 12, 2023, and gave birth to her child on June 19, 2023.  Claimant moved from the Philadelphia area to her current address in South Williamsport, Pennsylvania (PA), in late July/early August 2023, when she purchased a home for herself and her newborn child.  Claimant moved to South Williamsport to get away from Philadelphia.  Claimant's car transmission broke on May 6, 2023, and she closed on her new home in June 2023, just prior to giving birth.  Claimant resigned from her employment on September 2, 2023, the day that her unpaid maternity leave ended.

Claimant did not ask Employer to reassign her to clients in the Williamsport/Lycoming County area prior to purchasing her new home.  Rather, Claimant first inquired with Employer about a position closer to her new home at the conclusion of her maternity leave in late August 2023.  Employer did not have

---

[2] In her Statement of the Questions Involved, Claimant presents four issues: (1) whether she is eligible for UC benefits; (2) whether she timely reported her need for a location transfer; (3) whether continuing work was available had she not voluntarily left her employment; and (4) whether the employer's testimony was credible.  *See* Claimant Br. at 4.  All of Claimant's issues are subsumed in this Court's rephrasing of the issue and will be addressed accordingly.

[3] The Referee found as a fact, and the UCBR adopted it, that Claimant spent approximately 2 weeks out of an entire year completing her required 2 visits per year with each of the 64 to 70 clients on her caseload; however, Claimant testified that it took 2 weeks for *each* of the 2 required visits.  Specifically, Claimant testified: "if I had to get 64 clients scheduled[] in [2] weeks, I could do that, . . . and then a second time of the year that I had to travel, I would [ha]ve . . . set aside another [2] weeks."  Certified Record at 234-235.

work available for her in the Lycoming County area, but did offer her work in Tioga County, which is approximately one hour north of Claimant's new residence. However, Claimant's Philadelphia area caseload remained available to her following her maternity leave.

Claimant applied for UC benefits on November 20, 2023. On November 27, 2023, the Scranton UC Service Center (UC Service Center) found Claimant ineligible for UC benefits under Section 402(b) of the Law. Claimant appealed, and a Referee held a hearing on January 9, 2024. On January 25, 2024, the Referee affirmed the UC Service Center's decisions and assessed a non-fault overpayment in the amount of $3,620.00. Claimant appealed to the UCBR. On May 10, 2024, the UCBR affirmed the Referee's decisions, amended the Referee's findings of fact 7 and 10, and adopted and incorporated the Referee's remaining findings of fact and conclusions of law. Claimant appealed to this Court.[4]

Initially, Section 402(b) of the Law provides, in relevant part, that an employee shall be ineligible for UC benefits for any week "[i]n which h[er] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature[.]" 43 P.S. § 802(b). This Court has explained:

> "Whether a claimant had cause of a necessitous and compelling nature to quit a job is a conclusion of law subject to review by this Court." *Warwick v. Unemployment Comp[.] B[d.] of Rev[.]*, 700 A.2d 594, 596 (Pa. Cmwlth. 1997). "A claimant who voluntarily terminates h[er] employment has the burden of proving that a necessitous and compelling cause existed." *Solar Innovations, Inc. v. Unemployment Comp[.] B[d.] of Rev[.]*, 38 A.3d 1051, 1056 (Pa. Cmwlth. 2012). More specifically,

---

[4] This Court's review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. *See* Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

3

> [a] claimant who voluntarily quits [her] employment bears the burden of proving that necessitous and compelling reasons motivated that decision. In order to establish cause of a necessitous and compelling nature, a claimant must establish that (1) circumstances existed that produced real and substantial pressure to terminate employment, (2) like circumstances would compel a reasonable person to act in the same manner, (3) the claimant acted with ordinary common sense, and (4) the claimant made a reasonable effort to preserve her employment.
>
> *Middletown T[wp.] v. Unemployment Comp[.] B[d.] of Rev[.]*, 40 A.3d 217, 227-28 (Pa. Cmwlth. 2012) (citations omitted).

*Scheib v. Unemployment Comp. Bd. of Rev.*, 329 A.3d 827, 831 (Pa. Cmwlth. 2025).

Claimant argues that her separation from Employer was inevitable due to losing her means of reliable transportation, her car. Claimant contends that she made a good faith effort to avoid separating from Employer by exploring taking an Uber, public transportation, and ultimately paying an associate to drop her off and pick her up from her in-home client assessments until her supervisor could find coverage for her. Claimant further asserts that she relocated because her new home was far enough away from the violence and domestic issues that she was experiencing in Philadelphia, but still within Pennsylvania and, as she understood, Employer would be able to transfer her caseload. Finally, Claimant claims that Employer changed its policy to include more frequent in-home client assessments. Claimant maintains that Employer did not notify her when she was hired that the job required frequent travel.

The UCBR rejoins that Claimant quit her job after making the personal choice to relocate from Philadelphia to Williamsport while working for Employer, despite knowing that she was required to visit patients in Philadelphia in person at

4

least twice per year. The UCBR further retorts that Claimant did not notify Employer of her relocation to Williamsport until August of 2023, shortly before Claimant was scheduled to return from her maternity leave, when she asked for the first time about positions in that area. The UCBR asserts that Employer offered Claimant a position in Tioga County, but Claimant declined the offer and resigned on September 2, 2023.

Employer maintains that it provided credible evidence and testimony that it did not change its policies. Furthermore, Employer refutes Claimant's argument that she could have remained employed but for the increase of in-person visits and lack of transportation because she acknowledged she chose not to notify Employer of her relocation or inquire about the possibility of a transfer until the end of her maternity leave, at which point she was unable to continue to perform the duties of her Philadelphia-based job or accept the alternate position Employer offered her.

Claimant testified:

R[eferee:] Okay, all right. So, why did you leave your employment there?

C[laimant:] There was [sic] a number of reasons.

R[eferee:] What was the final reason, though that--

C[laimant:] The final reason was my relocation to South Williamsport in . . .

R[eferee:] Where did you live [] before?

C[laimant:] . . . in Philadelphia.

Certified Record (C.R.) at 232.

Claimant explained:

R[eferee:] So, how many clients did you have . . . ?

5

C[laimant:] I had, I want to say, 64 clients at the time. But signing on, there was no case load above 70 - supposed to be [sic].

R[eferee:] So, 64 to 70 clients. So, if you had to go to them all twice a year, was it all in the same month, or all throughout the year?

C[laimant:] It was just with my schedule. So, it would be based on how I scheduled them. So, initially, yeah, I would've probably scheduled them . . .

R[eferee:] So, were your clients in the Philadelphia area?

C[laimant:] . . . yes.

R[eferee:] So, if you moved away from the Philadelphia area, would that mean that you didn't have clients anymore?

C[laimant:] No, I could've still kept those clients under the original policy that I signed up for. I was actually looking to continue working in Philadelphia until I found work out here. I would just travel, you know, twice out of the year and schedule my clients based on, you know, their needs.

R[eferee:] Okay. So, all right, so, when you moved out here . . .

C[laimant:] Yes.

R[eferee:] . . . you were aware that you would have to travel to Philadelphia to see your clients?

C[laimant:] Yes.

R[eferee:] Okay, and you still bought a home here?

C[laimant:] Yes.

C.R. at 234.

When the Referee tried to clarify, Claimant described:

R[eferee:] Okay. So, but the rest of the time, then, you worked from home?

6

C[laimant:] Yes. So, it was remote, plus needing to travel to the clients two times out of the year.

R[eferee:] So, then, how often would you need to actually travel?

C[laimant:] If it was for my case load of 64, [2] times out of the year, so, I would probably only have to travel 128 times. But as I said, you can kind of schedule them all in a week or [2] weeks. So, if I had to get 64 clients scheduled, in [2] weeks, I could do that, you know, and do my traveling for those [2] weeks and then a second time of the year that I had to travel, I would've did another - set aside another [2] weeks. That's initially . . .

R[eferee:] So, in other words, about four weeks out of the year?

C[laimant:] Yes. So, for a month, I would be looking to be traveling for clients.

R[eferee:] Okay. So, when you moved to Williamsport, why didn't you just do that?

C[laimant:] They changed the policy. The policy was updated in either - I think either April or May, and it required us to travel more frequently. So, we had . . .

R[eferee:] How much more frequently?

C[laimant:] Pretty much every day, honestly.

C.R. at 234-235.

When Employers' Human Resource Analyst Camila Hagelgans (Hagelgans) attempted to clarify, Claimant related:

E[mployer's] W[itness:] I understand what you mean, but doesn't that mean that you still only had to visit the participants if their condition changed?

C[laimant:] That - yes, so, if their condition's changed and they were . . .

E[mployer's] W[itness:] So, you said you would be traveling 11 months out of the 12[?]

7

C[laimant:] That is correct.

E[mployer's] W[itness:] So, were your participants being hospitalized pretty much every day, then, that you had to go visit them on a daily basis?

C[laimant:] That is correct. Yes, we had - we have clients that were really, I mean, literally hospitalized every other week. We are dealing with elderly clientele which - with many health issues.

C.R. at 245.

Relative to Employer's purported policy change, Hagelgans described:

R[eferee:] So, do you have any other questions for [Claimant][?] . . .

E[mployer's] W[itness:] Okay, so, I'm trying to organize my thoughts, because I wasn't expecting her interview to be so long, so, I'm a little confused. Because [Claimant] said she was - okay. So, she was looking for a house already outside of Phil[adelphia] when she applied for this job. And **this job required her to see participants twice a year or when their condition[s] changed. That's what the documentation I sent [the Referee] said, and that was written in 2021 and it's the same policy until today**. But [Claimant] knew that she was looking for a house outside of Phil[adelphia], and the only moment she communicated that she would have to - and she says that she heard about the *supposedly changed* policy in April or May. So, it was even before she completed the purchase of the house. And [Claimant], again, never communicated that she would probably need to relocate somewhere closer until August when she was about to come back from maternity leave. . . .

R[eferee:] Okay.

E[mployer's] W[itness:] . . . . What I'm just trying to understand is why [Claimant] never communicated, even though she already knew she was looking for a home outside of Phil[adelphia]. And she even said that she knew about the *supposed change* in policy even before she finalized the purchase of the house and all that and she never communicated before so [Employer] could try and

8

find her a position closer to where she was instead of all this, like, less than a week before she was supposed to be coming back to work. That is my issue[] here.

R[eferee:] Okay. So, **why didn't you let them know**, like[] in April or so **that you needed the position closer to Williamsport then**?

C[laimant:] **I just - I didn't**.

R[eferee:] Okay.

E[mployer's] W[itness:] If she said something, I couldn't hear. Did she say more?

R[eferee:] She just said she didn't, she doesn't really have an answer.

E[mployer's] W[itness:] Okay. Oh, okay.

C.R. at 249 (bold and italic emphasis added).

"In UC cases, the [UCBR] is the ultimate fact[-]finder and resolves issues of credibility and conflicting evidence. This Court is bound by those findings, provided they are supported by substantial evidence." *Rivera v. Unemployment Comp. Bd. of Rev.*, 310 A.3d 348, 352 n.4 (Pa. Cmwlth. 2024) (citation omitted). "Substantial evidence is relevant evidence that a reasonable person may accept as adequate to support a finding." *Id.* Here, viewing the evidence in the light most favorable to the prevailing party, the UCBR, as this Court must, *see Hope v. Unemployment Comp. Bd. of Rev.*, 308 A.3d 944 (Pa. Cmwlth. 2024), this Court concludes that the UCBR's relevant findings of fact are supported by substantial evidence.

Based thereon, the UCBR concluded:

[C]laimant made the personal choice to relocate from Philadelphia to Williamsport while employed with [] Employer. [] Claimant contends a policy change by [] [E]mployer altered her work conditions from a near-fully remote work schedule with little travel to almost daily travel, which she could not do because of transportation

9

and distance. However, [] [E]mployer's credible testimony reflects that there was no policy change, and the constant travel testified to by [] [C]laimant would not have been possible. Furthermore, [] [C]laimant waited months before inquiring with [] [E]mployer about a position closer to her new home, and declined a position offered to her because she felt it was still too far. The [UCBR] finds [] [C]laimant has not met her burden of evidencing a necessitous and compelling reason to voluntarily quit under Section 402(b) of the Law.

UCBR Dec. at 2. This Court discerns no error in the UCBR's reasoning.

For all of the above reasons, the UCBR's orders are affirmed.

_____
ANNE E. COVEY, Judge

10

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Shakeelah Finney, | : | CASES CONSOLIDATED |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Unemployment Compensation | : | |
| Board of Review, | : | Nos. 807-809 C.D. 2024 |
| Respondent | : | |

# O R D E R

AND NOW, this 9th day of September, 2025, the Unemployment Compensation Board of Review's May 10, 2024 orders are affirmed.

_____

ANNE E. COVEY, Judge